# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | Case No. 3:12-CR-00124-SI |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| **CHRISTOPHER LEE CARLSON**, | ) | **ON MOTION TO SUPPRESS** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

S. Amanda Marshall, United States Attorney, Stephen F. Peifer, Assistant United States Attorney, and David L. Atkinson, Assistant United States Attorney, District of Oregon, 1000 SW Third Avenue, Suite 600, Portland, Oregon 97204.  Attorneys for Plaintiff.

Ellen C. Pitcher, Office of the Federal Public Defender, 101 SW Main Street Suite 1700, Portland, Oregon 97204. Attorney for Defendant.

**Michael H. Simon, District Judge.**

A grand jury has indicted Christopher Lee Carlson ("Mr. Carlson" or "Defendant") and charged him with mailing threatening letters to five U.S. Senators and the Speaker of the U.S. House of Representatives in violation of 18 U.S.C. §§ 876(c) and 1114. The grand jury also charged him with six counts of perpetrating a hoax regarding a lethal pathogen in violation of 18 U.S.C. §§ 1038(a) and 175. Mr. Carlson moves to suppress evidence seized during several searches that he asserts were conducted in violation of his Fourth Amendment rights. *See* Mot. Suppress Evid., Dkt. 35. At Mr. Carlson's request, unopposed by the Government, the Court held

an evidentiary hearing on April 3, 2013, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Based on the following findings of fact and conclusions of law, the Court DENIES Mr. Carlson's Motion to Suppress.

## FINDINGS OF FACT

### I.     The February 2012 Mailings

Between February 18 and February 20, 2012, approximately one hundred envelopes postmarked from Portland, Oregon, were mailed to Members of Congress and the media. *Franks* Hr'g Tr. 16-18 Apr. 3, 2013 (hereafter "Tr."). The envelopes contained a white powdery substance and a small photograph of the singer Johnny Cash holding a guitar and raising his middle finger, over which was superimposed a blog URL, "http://th3man1n6lack.tumblr.com," and a Twitter feed, "@Th3_MIB." *See* Tr. 25; Ex. 6, Dkt. 64.[1]

Each envelope also contained one of four typewritten notes. The notes expressed frustration with politicians, corporations, and lobbyists. One note stated, "It's time for the American Revolution 2.0" and was signed "The MIB." It concluded with the postscript, "Oh yeah, the powder. 50 Senators were randomly selected to receive this letter as opposed to the other one. Since I put the bug in ten of these letters, again randomly selected, there's a 20% chance that you've just been exposed. If you aren't wearing a biohazard suit, anyway." Ex. 3, Dkt. 51.

Another note began, "That powdery stuff that just fell out of this letter along with my calling card is just cornstarch and celery salt. It won't hurt you, promise. =)"[2] This note was also

---

[1] Exhibits refer to those received during the *Franks* evidentiary hearing held April 3, 2013. *See* Dkts. 48-56, 64.

[2] The author's "calling card" is presumably the photograph of Johnny Cash.

signed, "The MIB" and ended with the sentence, "So please, for the sake of your countrymen, put on your big-boy pants or your big-girl panties, suck it up, and do the job you were elected to do." Ex. 5, Dkt. 53. The FBI ultimately determined that the white powder was a harmless combination of cornstarch and celery salt. Tr. 193.

About half of the letters were mailed in white envelopes with the return address of "The MIB, LLC, 2413 NW Burnside, Portland, Oregon 97209." Tr. 18-19; Dkt. 40-1 ¶ 9. The rest were sent in pastel-colored envelopes with the return address of "Miss Billie L. Themani, 1776 N. Black Road, Beaverton, OR 97005." Tr. 19; Dkt. 40-1 ¶ 9.

The public media reports on these mailings did not contain all of these details. Although the media reported on the "The MIB, LLC" return address found on the white envelopes, there was no public disclosure of the Johnny Cash photograph, the "Miss Billie L. Themani" return address, or the specific words used in the notes, in particular the instruction to "put on your big-boy pants or your big-girl panties." Tr. 28-29, 36, 48.

## II. Adrienne Carlson Contacts the FBI (March 5, 2012)

Before March 5, 2012, the Federal Bureau of Investigation ("FBI") had not identified any witnesses or suspects for these mailings. Tr. 100. Then, around 3 p.m. on March 5, Special Agent ("SA") MariJo Byers of the FBI took a call from a woman named Adrienne Carlson. Tr. 8-9. Ms. Carlson said she was calling about "some white powder letters," but she asked SA Byers to call her back because she was afraid that her husband would see from her phone records that she had called the FBI. Tr. 9. When SA Byers called Ms. Carlson back, Ms. Carlson said she was certain that her husband, Christopher Carlson, was sending threatening letters to U.S. Senators that contained photographs of Johnny Cash and a white powder made up of celery salt and

cornstarch. Tr. 9-10. She also told SA Byers that her husband had been behaving erratically and had left their apartment with a shotgun and a handgun. Tr. 10. Ms. Carlson wanted someone to come to her apartment right away to collect Mr. Carlson's computer and confirm her allegations. Tr. 11. SA Byers, who has significant experience handling telephone calls from the public, described Ms. Carlson's demeanor during this telephone call as articulate, clear, and sober. Tr. 12.

SA Byers passed this information on to the FBI "command post" working on the white powder letters. Tr. 11. Special Agents Craig Mueller and Ronald Stankye, who were working on the case, had already learned that Ms. Carlson had called the Vancouver Police Department the day before, on March 4, 2012, with similar information. Tr. 30. At 4 p.m. on March 5, 2012, SA Mueller and SA Stankye called Ms. Carlson and interviewed her by speakerphone. Tr. 31. Present during this telephone interview were Special Agents Jennifer Burnett, Wade Mutchler, Rick Werder, and Travis Gluesenkamp. Tr. 32, 201.

During the telephone interview, Ms. Carlson explained that her relationship with her husband was emotionally abusive and that she had been staying at a domestic violence shelter. Tr. 32-33, 101. Ms. Carlson recounted returning to her apartment sometime around President's Day weekend. Tr. 35.[3] She stated that on a table in the bedroom that she and her husband used as an office, she saw stacks of white business envelopes, letters, and what she described as "post-it–

_____

[3] The precise dates of Ms. Carlson's two interactions with her husband in late February 2012 are not clear. SA Mueller testified that, based on his conversations with Ms. Carlson, they likely occurred during the week and weekend directly before President's Day, which was Monday, February 20, 2012. Tr. 35, 39. Special Agent Jessica Anderson testified that Ms. Carlson's recollection of dates was not as strong as her recollection of particular events, but that it appeared these interactions may have occurred the week after President's Day. *See* Tr. 154-157. The Court does not make a finding of fact as to the dates these interactions occurred; the existence and sequence of these events is more important that their exact timing.

sized" copies of a photograph of Johnny Cash raising his middle finger. Tr. 35-37. She also explained that the photograph had a URL on it for a Tumblr blog. Tr. 37. She added that Mr. Carlson, who was seated at the computer, read to her from a letter he had written; Ms. Carlson remembered it had a line in it about pulling up "your big-boy pants and big-girl panties." Tr. 36. According to Ms. Carlson, Mr. Carlson told her that if the letters he sent did not receive adequate attention, he would send another batch containing lye, and if that did not work, he would send improvised explosive devices. Tr. 34.

Ms. Carlson also recounted that her husband had asked her to return to the apartment the following weekend. Tr. 39-40. He told her that he wanted her to drive him past a specific post office in southeast Portland to look for video surveillance cameras that might have recorded him mailing letters. Tr. 40. She did as he requested. *Id.*

In addition, Ms. Carlson told the agents that her husband knew that she had changed her name from "Billie Lee Cesano" and "Billie Lee Williams" to "Adrienne Lee Carlson." Tr. 47-48. She also spoke in some detail about her husband's mental health and medications. Tr. 45-47. Ms. Carlson's own mental health and use of medications, however, were not mentioned. Tr. 48-49, 63.  SA Mueller testified that during this call, Ms. Carlson sounded normal, lucid, and articulate. Tr. 49. She was easy to understand and did not seem intoxicated, delusional, or otherwise unreliable. *Id.*

Based primarily on this March 5 telephone interview, SA Gluesenkamp prepared an affidavit for a search warrant. Tr. 52, 201-202, 206. He submitted the affidavit to the Department of Justice early in the morning of March 6 for approval before he presented it to a U.S. Magistrate Judge. Tr. 202-203, 205.

### III.    In-Person Interview of Ms. Carlson (March 6, 2012)

Shortly after midnight on March 6, Ms. Carlson called the FBI again and was put through to SA Mueller. Tr. 53. She told SA Mueller that she had found a Wal-Mart receipt in her apartment showing the purchase of envelopes and labels on February 14, 2012. Tr. 53-54.

Around 2:30 p.m. on March 6, SA Mueller and Special Agent Jessica Anderson went to Vancouver, Washington, to interview Ms. Carlson in person at the Carlson residence. Tr. 55. Ms. Carlson invited them into the apartment and showed them the Wal-Mart receipt and the office where she had seen the mailing supplies. Tr. 55-56, 140. SA Anderson and SA Mueller both testified that Ms. Carlson was rational and lucid during this interview, although she was emotional about turning in her husband. Tr. 60, 144-146.

Concerned that Mr. Carlson might be dangerous, the agents offered to take Ms. Carlson to a hotel room in downtown Portland. Tr. 61, 141-142, 164. SA Anderson asked Ms. Carlson if she had everything with her that she would need for a few days, including any medications, and Ms. Carlson said that she did. Tr. 142. They left the apartment together around 3:15 p.m. Tr. 62.

### IV.    The Initial Search Warrants (March 6, 2012)

At approximately 4:40 p.m. on March 6, 2012, SA Gluesenkamp submitted his first affidavit to U.S. Magistrate Judge Patricia Sullivan to obtain search warrants for the Carlsons' apartment and for Mr. Carlson's Chevy Malibu.[4] The affidavit described the letters containing white powder and the Vancouver Police Department's report on Ms. Carlson's initial telephone

---

[4] According to the Government, there was a delay in submitting the affidavit because the anticipated search would occur in a different jurisdiction, which required review and approval by Justice Department attorneys in Washington, D.C. *See* Tr. 210. There may also have been discussions among the Government's lawyers about the applicability of the confidential marital communications privilege at some point during the investigation. *See* Tr. 191-192.

call. Dkt. 40-1 ¶¶ 9-16. It also described at length what Ms. Carlson told the FBI during the

March 5 telephone interview, *id.* at ¶¶ 17-23, in particular that Mr. Carlson read to Ms. Carlson a

letter that contained a sentence about pulling up "your big boy pants and big girl panties," *id.* at

¶¶ 17-18; that Ms. Carlson "saw a stack of letters, a stack of white business envelopes, and a

stack of small cut-out photographs of a picture of a popular musician gesturing with his middle

finger," *id.* at ¶ 18; and that Mr. Carslon was aware that his wife had previously used the name

"Billie Lee," *id.* at ¶ 22. The affidavit did not contain any additional information learned by

SA Mueller and SA Anderson during their recent in-person interview with Ms. Carlson. *See*

Tr. 202-203.

Judge Sullivan signed the first search warrants shortly after 5:00 p.m on March 6, 2012.

*See* Dkt. 40-1 at 2. The warrant for the Carlson apartment was executed that evening

at 7:25 p.m., and the FBI seized electronic evidence and the Wal-Mart receipt. Tr. 64.

## V.    Ms. Carlson's Use of Medications at the Hotel (March 6, 2012)

Between the evening of March 6 and March 10, 2012, FBI agents stayed with

Ms. Carlson at a hotel in downtown Portland and continued to interview her. Special Agent Tara

Watanathai was with Ms. Carlson the evening of March 6. Tr. 171-172. Before going to bed,

Ms. Carlson asked SA Watanathai if Ms. Carlson could take her prescribed medications, which

included Valium and what she described as a "mood stabilizer," and SA Watanathai said that she

could. Tr. 174. In case there were medical complications, SA Watanathai told her partner and the

two agents who relieved her that Ms. Carlson had taken some medications, and she included this

information in her report. Tr. 175. Because SA Watanathai did not think that the medications

were significant, she did not immediately notify any other agents working on the case. *Id.*

**VI.     The Second and Third Sets of Search Warrants (March 7-10, 2012)**

The next morning, March 7, SA Mueller and SA Mutchler intercepted Mr. Carlson at his

dentist's office. Tr. 65. They interviewed him briefly at a nearby McDonald's until Mr. Carlson

requested an attorney. Tr. 69-71. The agents then seized Mr. Carlson's car pursuant to the

March 6 search warrant and called a taxi for Mr. Carlson. Tr. 71. Mr. Carlson also gave them his

iPhone at their request, but he did not consent to its search. Tr. 67-68.

At approximately 2:20 p.m. on March 7, 2012, SA Gluesenkamp submitted a second set

of search warrant applications to Judge Sullivan. His revised affidavit included the information

learned from Mr. Carlson during the McDonald's conversation, but it did not include any

information obtained pursuant to the first set of search warrants or from interviews with

Ms. Carlson after the March 5 telephone interview. Tr. 73, 207. Around 2:45 p.m. on March 7,

Judge Sullivan signed search warrants for Mr. Carlson's person, his iPhone, and the hotel room

where he was staying. Dkt. 42-1 at 1-3.

FBI agents executed the search warrant for the hotel room in the early evening of

March 7, 2012. Tr. 75. Among other items, they seized a thumb drive containing drafts of the

letters sent to the Members of Congress, a document with multiple copies of the reduced-size

Johnny Cash photograph, and a spreadsheet. Tr. 76; *see also* Ex. 103. It is primarily the fruits of

this search that Defendant seeks to suppress.

Early in the morning of March 9, 2012, FBI agents executed the search warrant for

Mr. Carlson's person and found Mr. Carlson barricaded in his apartment with self-inflicted

injuries. Tr. 84-87. After a brief hospitalization, Mr. Carlson was transported to the Pierce

County Jail in Tacoma on March 10, 2012. Tr. 90-91. Two additional search warrants were

obtained on March 9, Tr. 88, but Defendant does not include these in his Motion to Suppress. Def.'s Post-Hr'g Mem. Supp. Mot., Dkt. 61, at 3.

## VII.    Credibility Determinations and Factual Ambiguities

The Court finds all the witnesses who testified during the *Franks* hearing to be believable and honest. Although Ms. Carlson testified that she is again living with her husband and that she loves him, she was nonetheless credible in her testimony. The Court attributes any differences in the witnesses' testimony to the passage of time and the fallibility of memory. For example, Ms. Carlson testified that she has no specific memory of the telephone interview with the FBI on March 5, 2012. Tr. 212. The Court finds that the March 5 telephone interview did occur and further finds that Ms. Carlson made the statements during that interview that the FBI witnesses attribute to her.

Two additional discrepancies in the witnesses' accounts merit further discussion. First, Ms. Carlson testified that she told the FBI agents, and particularly SA Anderson, about her mental health history, including that she had been hospitalized recently for mental illness, that she suffered from bipolar disorder and PTSD, that she took certain medications, and that she saw a therapist. Tr. 214-216. It is not clear, however, whether Ms. Carlson remembers discussing all of these issues during the March 6 interview in her apartment.[5] SA Anderson does not believe that she learned about Ms. Carlson's therapist or her specific medications during their first interview at Ms. Carlson's apartment; she only recalls learning this information during their later

---

[5] During the *Franks* hearing, Ms. Carlson was asked specifically about the March 6 interview at the Vancouver apartment, Tr. 212:10-12, but as the examination continued, Ms. Carlson explained that she only elaborated on her history and mental health later on because SA Anderson "kept asking." *See* Tr. 213:15-18; *see also* Tr. 225-226 (Ms. Carlson thought that the discussion about her medications occurred at the Vancouver apartment but that the discussion about her therapist occurred later at the hotel).

interviews at the hotel in downtown Portland. Tr. 146, 152. Further, SA Anderson has no recollection of Ms. Carlson ever telling her about her medical diagnosis or hospitalization. Tr. 232-233.

To the extent that the memories of Ms. Carlson and SA Anderson differ, the Court gives greater weight to SA Anderson's account for two reasons. First, Ms. Carlson does not remember the March 5 telephone interview with the FBI and had trouble distinguishing among the different interviews that she had with the agents. Second, SA Anderson's memory was assisted by reports that she prepared contemporaneously with her interviews.

The Court finds that Ms. Carlson did not provide significant information about her mental health history during the March 6 interview at her apartment, although Ms. Carlson may have mentioned her medications to SA Anderson in response to SA Anderson's suggestion that Ms. Carlson gather her belongings, including any medication, before leaving the apartment for the hotel. The Court also finds that Ms. Carlson first told SA Anderson that she saw a therapist no earlier than the afternoon of March 7 at the hotel, a point on which Ms. Carlson and SA Anderson do not seem to disagree. *See* Tr. 226. Finally, particularly given SA Anderson's clear and emphatic testimony that Ms. Carlson never told her about her hospitalization or mental health diagnosis, and bearing in mind that Defendant bears the burden of proof by a preponderance of the evidence in a *Franks* hearing, *see Franks*, 438 U.S. at 156, the Court finds that Ms. Carlson did not provide significant information about her mental health history to SA Anderson before their first interview at the hotel on the afternoon of March 7, 2012, if at all.

Second, when Ms. Carlson first returned to her apartment in February 2012 and saw the mailing supplies in the office, her husband, Mr. Carlson, handed her a photograph of Johnny

Cash and then asked for it back. Tr. 149, 226. On that occasion, she also saw a stack of what she assumed were copies of the same photograph on the table in the office. Tr. 35, 103, 127, 149-150, 226-227. As discussed below, the fact that Mr. Carlson handed Ms. Carlson one of the photographs may have legal import. The March 6 and March 7 search warrant affidavits, however, do not explain that Mr. Carlson handed Ms. Carlson one of the photographs; they only state that Ms. Carlson saw the photographs. The omission of this detail from the affidavits may be significant, but only if the FBI was aware of that detail before SA Gluesenkamp submitted the search warrant applications to Judge Sullivan.

The Court finds that during the initial telephone interview on March 5, 2012, Ms. Carlson only stated that she saw the photographs and did not mention that her husband handed one of them to her. *See, e.g.*, Tr. 122:17-20. The Court further finds that Ms. Carlson later clarified to SA Anderson during the hotel interviews, at some point between March 7 and March 10, that Mr. Carlson had handed one of the photographs to her. Tr. 149.

Whether Ms. Carlson had first made this clarification to SA Mueller and SA Anderson during the March 6 interview at her apartment is less clear, however. The cross-examination of SA Mueller on this point is inconclusive, at least without the date of the referenced report prepared by SA Anderson, which has not been submitted to the Court. *See* Tr. 121-123. Ms. Carlson did not testify that she told SA Mueller and SA Anderson during the March 6 interview that her husband handed her the photograph. *See* Tr. 226. SA Anderson's testimony indicates that Ms. Carlson first provided this information during the hotel interviews. *Compare* Tr. 140:16-22 (interview at apartment) *with* Tr. 149 (interview at hotel). Based on the evidence presented, and bearing in mind the Defendant's burden of proof, the Court finds that Ms. Carlson

did not tell SA Mueller and SA Anderson during the interview on March 6 that her husband had handed her the photograph of Johnny Cash.

## CONCLUSIONS OF LAW

Mr. Carlson moves to suppress the evidence seized pursuant to the FBI's search warrants, in particular those issued on March 7, 2012. When evidence has been obtained in violation of a defendant's Fourth Amendment rights, courts may apply the exclusionary rule to bar the use of that evidence by the prosecution.[6] *Davis v. United States*, --- U.S. ----, 131 S. Ct. 2419, 2426 (2011). The exclusionary rule, however, is not intended to redress the defendant's own constitutional injury. *Id.* "The [exclusionary] rule's sole purpose … is to deter *future* Fourth Amendment violations." *Id.* (emphasis added). Accordingly, suppression is not warranted in all cases where there has been a Fourth Amendment violation, but "only in those unusual cases in which exclusion will further the [deterrent] purposes of the exclusionary rule." *United States v. Leon*, 468 U.S. 897, 918 (1984). Thus, even when there has been a Fourth Amendment violation, a court must resolve two additional questions before suppressing evidence: Will the suppression of evidence in this case "alter the behavior of individual law enforcement officers or the policies of their departments" going forward? *Id.*; *see also Davis*, 131 S. Ct. at 2432. And, given that suppression of otherwise reliable evidence "exacts a heavy toll on both the judicial system and society at large," will "the deterrence benefits of suppression … outweigh its heavy costs"? *Davis*, 131 S. Ct. at 2427.

---

[6] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court has recognized the deterrent benefits of suppression in two broad categories of cases: those in which the police were dishonest or reckless in initially presenting information to the magistrate judge, and those in which a magistrate has approved the search warrant but the warrant was so clearly defective that the police "could not have harbored an objectively reasonable belief" that it passed constitutional muster. *See Leon*, 468 U.S. at 926. The former set of cases is governed by *Franks v. Delaware*, 438 U.S. 154 (1978). The latter set of cases is categorized in *Leon* as those situations in which no reasonable officer could have relied on the issued warrant in good faith: for example, because the search warrant was facially deficient, because the "issuing magistrate wholly abandoned his judicial role," or because probable cause was clearly lacking. *Leon*, 468 U.S. at 923. Mr. Carlson argues under *Franks* that the FBI agents omitted material information from the search warrant affidavits either deliberately or with reckless disregard for the truth.

## I.      *Franks v. Delaware*

Under *Franks*, a search warrant must be voided and the fruits of the search excluded from trial if both of two conditions are met: (1) the defendant establishes by a preponderance of the evidence that the affiant included false information in the search warrant affidavit either knowingly and intentionally, or with reckless disregard for the truth; and (2) with the false material set aside, the affidavit is insufficient to establish probable cause. *Franks*, 438 U.S. at 155-56. *Franks* also applies to material omissions where (1) the omission is the result of deliberate or reckless disregard for the truth, and (2) without the omission, the affidavit would have been insufficient to establish probable cause. *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994).  Mr. Carlson offers two independent arguments for why the evidence seized should

be suppressed under *Franks*.

A.      *Ms. Carlson's Credibility*

First, Mr. Carlson argues that the FBI agents deliberately or recklessly omitted from the affidavits information regarding Ms. Carlson's mental health and medication regimen. This information, according to Mr. Carlson, would have cast doubt on Ms. Carlson's reliability as an informant, which in turn would have undermined the existence of probable cause based on her statements.

The Court concludes that Defendant has not carried his burden of proof in establishing deliberate or reckless conduct by the FBI agents in failing to include information about Ms. Carlson's mental health in the affidavits. The FBI agents consistently testified that Ms. Carlson exhibited no outward or obvious indications of mental or emotional instability and that there was no indication she was under the influence of drugs or intoxicants. Further, and significantly, the agents could independently verify her reliability because she knew many details about the letters containing the white powder that had not been made public, including the presence of the Johnny Cash photograph, the Tumblr address, and the specific contents of one of the letters. There were no warning signs that should have spurred the agents to inquire further into Ms. Carlson's competence or reliability as an informant.

As for information that the agents did have regarding Ms. Carlson's mental health and medications, the omission of that information was neither deliberate nor in reckless disregard for the truth. The Court accepts SA Gluesenkamp's representation that the March 6 affidavit was drafted immediately after the March 5 telephone interview, during which there was no discussion of Ms. Carlson's mental health. The March 7 affidavit was submitted at the same time as

OPINION AND ORDER ON MOTION TO SUPPRESS, Page 14

be suppressed under *Franks*.

A.      *Ms. Carlson's Credibility*

First, Mr. Carlson argues that the FBI agents deliberately or recklessly omitted from the affidavits information regarding Ms. Carlson's mental health and medication regimen. This information, according to Mr. Carlson, would have cast doubt on Ms. Carlson's reliability as an informant, which in turn would have undermined the existence of probable cause based on her statements.

The Court concludes that Defendant has not carried his burden of proof in establishing deliberate or reckless conduct by the FBI agents in failing to include information about Ms. Carlson's mental health in the affidavits. The FBI agents consistently testified that Ms. Carlson exhibited no outward or obvious indications of mental or emotional instability and that there was no indication she was under the influence of drugs or intoxicants. Further, and significantly, the agents could independently verify her reliability because she knew many details about the letters containing the white powder that had not been made public, including the presence of the Johnny Cash photograph, the Tumblr address, and the specific contents of one of the letters. There were no warning signs that should have spurred the agents to inquire further into Ms. Carlson's competence or reliability as an informant.

As for information that the agents did have regarding Ms. Carlson's mental health and medications, the omission of that information was neither deliberate nor in reckless disregard for the truth. The Court accepts SA Gluesenkamp's representation that the March 6 affidavit was drafted immediately after the March 5 telephone interview, during which there was no discussion of Ms. Carlson's mental health. The March 7 affidavit was submitted at the same time as

SA Anderson provided to her supervisor the full list of Ms. Carlson's medications. Tr. 152. The Court has also found that even if Ms. Carlson had provided detailed information about her mental health to SA Anderson, she did not do so earlier than SA Anderson's interview of Ms. Carlson at the hotel on March 7, and there is no indication that SA Anderson could have conveyed that information to SA Gluesenkamp in time for it to be included in the second set of search warrant applications. Although Ms. Carlson may have mentioned her medications to SA Anderson at the apartment on March 6, and while SA Watanathai was aware that Ms. Carlson took Valium and a "mood stabilizer" before going to bed on March 6, that information was not so critical to Ms. Carlson's reliability that the agents' failure to report it immediately to those preparing the search warrants could be considered either deliberate or reckless.

Further, even if the affidavits had included information about Ms. Carlson's mental health and medication regimen, other indicia of Ms. Carlson's reliability would still have supported probable cause for the warrants. In particular, Ms. Carlson had described the small Johnny Cash photograph, a distinctive detail in the case that had not previously been disclosed publicly. That Ms. Carlson saw the stack of photographs in the office of her apartment and in the presence of her husband was sufficient to establish probable cause vis-à-vis Mr. Carlson.[7] Thus, even if the FBI agents had deliberately or in reckless disregard for the truth withheld from Judge Sullivan information about Ms. Carlson's health and medications, and even if Judge Sullivan had been aware of that information, the affidavits still would have been sufficient to establish probable cause for all seven search warrants.

_____

[7] This information was also not privileged, for the reasons discussed below.

B.       *The Source of Ms. Carlson's Information*

Second, Mr. Carlson argues that the affidavits did not consistently identify Mr. Carlson as the source of Ms. Carlson's information. According to Mr. Carlson, these elisions may have mislead Judge Sullivan in making her probable cause determination by obscuring what information in the affidavits derived from privileged confidential marital communications.

As a preliminary matter, most of the examples of information cited by Defendant, when read in context, are in fact attributed to Mr. Carlson. Mr. Carlson largely concedes this point in his reply. *See* Def.'s Reply, Dkt. 47, at 26. He argues, however, that Ms. Carlson's knowledge of the Johnny Cash photographs was derived from confidential marital communications and that this distinction was not clearly made in the affidavits.

The confidential marital communications privilege is one of two distinct marital privileges recognized by the Supreme Court. *See United States v. Montgomery*, 384 F.3d 1050, 1056 (9th Cir. 2004).[8] For this privilege to apply, there must be (1) a valid marriage and (2) words, or acts intended to be a communication, exchanged between the spouses that are (3) confidential, meaning that they are not exchanged in the presence of, or likely to be overheard by, third parties. *Id.* The privilege can be invoked by either spouse, which means that Ms. Carlson cannot unilaterally waive this privilege.

Under Federal Rule of Evidence 1101, "[t]he rules on privilege apply to all stages of a case or proceeding," including "miscellaneous proceedings such as … issuing an arrest warrant, criminal summons, or search warrant." Fed. R. Evid. 1101(c), (d); *see also United States v.*

---

[8] The other marital privilege, which is not at issue in the present motion, permits a witness to refuse to testify against his or her current spouse and can be waived by the testifying spouse. *Montgomery*, 384 F.3d at 1056.

*Lefkowitz*, 618 F.2d 1313, 1317 n.5 (9th Cir. 1980) ("The Federal Rule of Evidence with respect to privileges applies to proceedings for the issuance of search warrants."). This rule is directed at the courts, not at the law enforcement officers who apply for a warrant. As a general matter, the Federal Rules of Evidence govern how a court conducts its business in the courthouse. Indeed, the very concept of "privileged information" is intrinsically linked to court proceedings: the disclosure of the same information outside of a courtroom—for example, to a police officer—is most accurately described as a breach of confidentiality, not as a violation of privilege. *See* Robert P. Mosteller, *Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity*, 81 Wash. U. L. Q. 961, 961 n.4 (2003) (hereafter "Mosteller, *Admissibility of Fruits of Breached Evidentiary Privileges*"); Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.6.6 (Supp. 2012).[9] For these reasons, the Court reads Federal Rule of Evidence 1101 as directing judicial officers, including magistrate judges, to identify and disregard privileged information when reviewing warrant applications. For judicial officers, including magistrate judges, to follow this instruction, however, law enforcement officers must not withhold material information from the judicial officer regarding a privileged source of evidence.

The Government agrees that the magistrate judge must comply with Federal Rule of Evidence 1101 when reviewing warrant applications. It is also undisputed that Mr. and Ms. Carlson were validly married as of February 2012, and there is no evidence that anyone else was present during the relevant conversations, which would destroy the confidentiality of any

---

[9] Indeed, as discussed below, the marital privileges do not prevent police from using confidential information obtained from spouses in their investigations. *See, e.g.*, *Trammel v. United States*, 445 U.S. 40, 52 n.12 (1980).

communication. Further, the Government conceded during oral argument on May 3, 2013, that Mr. Carlson's act of handing over (and taking back) the Johnny Cash photograph was a communicative act.[10]

Under the rubric of *Franks*, the Court must address two questions: Did the FBI agents act deliberately or in reckless disregard for the truth in failing to specify the full circumstances in which Ms. Carlson learned of the photographs? If so, would an affidavit containing that additional information still have established probable cause?

On the first question, there is no evidence that the omission of this information was deliberate or reckless. Ms. Carlson did not mention during the initial March 5 telephone interview with the FBI that her husband handed her the photograph of Johnny Cash, and the Court has found that she also did not make this clarification during the March 6 interview at her apartment.

On the second question, even if the affidavit had explained that Mr. Carlson handed a photograph of Johnny Cash to Ms. Carlson, the affidavit still would have been sufficient to establish probable cause. The Court has found that Ms. Carlson personally observed the stack of photographs in addition to being handed one of them. That personal observation was not a confidential marital communication. *Cf. Lefkowitz*, 618 F.2d at 1318 (holding that a wife's observation of boxes of files being moved into offices was not a communicative act protected by the marital privilege). It may be that her awareness of the stack of photographs was informed by

---

[10] Among other arguments, the Government asserts that two exceptions to the confidential marital communications privilege apply: the joint criminal activity exception, which has been recognized by the Ninth Circuit, *United States v. Marashi*, 913 F.2d 724, 731 (9th Cir. 1990), and an exception for emergencies that threaten public safety, which the Government asks the Court to recognize as a matter of first impression. The Court, however, does not reach either of these arguments because it resolves the motion in favor of the Government on other grounds.

the specific photograph that she was handed by her husband, or that she studied the photograph she held more closely than those stacked on the table, but to separate out entirely her observation of the stack of photographs from her knowledge of the photograph handed to her by Mr. Carlson would require the Court to engage in speculation not warranted by the evidence. The Court is satisfied that Ms. Carlson observed the stack of photographs sufficiently to recognize that they were photographs of a musician raising his middle finger.[11] And that piece of information was in turn sufficient to establish probable cause, particularly when bolstered by the non-confidential information that Ms. Carlson's former name was "Billie Lee," which matched the return address on approximately half of the envelopes.[12]

In sum, Mr. Carlson has not established grounds for suppression under *Franks*.

## II. Other Grounds for Suppression

Mr. Carlson also argues that probable cause for a search warrant cannot be based on privileged information. The Court has concluded that the search warrants did not rely on privileged information because Ms. Carlson's non-privileged observation of the stack of Johnny Cash photographs and her prior name (Billie Lee) were sufficient to establish probable cause.

---

[11] According to the search warrant affidavits, when Ms. Carlson called the Vancouver Police Department on March 4, 2012, she volunteered that her husband often signed documents "MIB," which she explained stood for "Man in Black." Dkt. 40-1 ¶ 16. Johnny Cash was popularly known as the "Man in Black." Tr. 19. If Ms. Carlson knew that her husband often signed "MIB," it is a logical inference that she knew who Johnny Cash was and that her husband associated himself with Johnny Cash, and that in turn increases the likelihood that she would have recognized the specific musician in the photograph. Nonetheless, a casual observer of the small stack of photographs would have noticed the guitar and finger, which are the photograph's focal points, and the existence of a small photograph of a musician raising his middle finger was a sufficiently distinctive—and nonpublic—detail of the crime to establish probable cause.

[12] As noted above, the return address on half of the envelopes was "Miss Billie Lee Themani … N. Black …." Dkt. 40-1 ¶ 9. This return address was not mentioned in media reports. Tr. 48.

Nonetheless, the Court will briefly address the two additional arguments it understands

Mr. Carlson to be asserting: that the magistrate judge erred in finding probable cause despite the

affidavits' reliance on privileged marital communications and that the affidavits were based on

"illegally obtained evidence," *see* Def.'s Am. Mem. Supp. Mot. Suppress Evid., Dkt. 40, at 21.

    A.      *The Role of the Magistrate Judge*

The Court and the Government agree with Mr. Carlson that it is the magistrate judge's

role to identify privileged information in a search warrant application and to exclude such

information from his or her determination of the existence of probable cause. The magistrate

judge in this case committed no error because the affidavits contained sufficient non-privileged

information to establish probable cause. But even if the magistrate judge had erred and approved

the warrants despite the affidavits' material reliance on privileged information, suppression of

the evidence seized would still not be appropriate.

"[T]he exclusionary rule is designed to deter police misconduct rather than to punish the

errors of judges and magistrates." *Leon*, 468 U.S. at 916. This is because magistrates and judges

are "neutral judicial officers" who "have no stake in the outcome of particular criminal

prosecutions." *Id.* at 917. When a court holds that a judicial officer erred in issuing a search

warrant, suppressing evidence obtained by that warrant will not better inform the judicial officer

of his or her mistake, while admitting such evidence will "in no way reduce judicial officers'

professional incentives to comply with the Fourth Amendment." *Id.* Further, if a magistrate judge

erroneously signs a search warrant that is not obviously constitutionally deficient, courts will not

suppress evidence seized by the police in reliance on that warrant. *See id.* at 921 ("Penalizing the

officer for the magistrate's error, rather than his own, cannot logically contribute to the

deterrence of Fourth Amendment violations."); *see also Davis*, 131 S. Ct. at 2428-29. In short, suppression would not be an appropriate remedy even if the magistrate judge had made a legal error in approving the search warrants.

B.     *Illegally Obtained Evidence*

Mr. Carlson also argues that a search warrant does not pass constitutional muster if probable cause for the warrant is based on "illegally obtained information." *See* Def.'s Am. Mem. Supp. Mot. Suppress Evid., Dkt. 40, at 21 (citing *United States v. Murray*, 487 U.S. 533 (1988)). The confidential marital communications in question, however, were not "illegally obtained." No privilege "prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension." *Trammel v. United States*, 445 U.S. 40, 52 n.12 (1980). Courts have consistently held that police may use confidential marital communications to investigate crimes, particularly when one spouse volunteers the information. *See, e.g.*, *United States v. Harper*, 450 F.2d 1032, 1046 (5th Cir. 1971) ("[W]e conclude that the Government did not violate the privilege for confidential marital communications when it used [defendant's wife's] statements as a basis for its investigation of [defendant's] illegal activities and did not attempt to introduce any such statements into evidence at [defendant's] trial."); *United States v. Giavasis*, 805 F.2d 1037, 1986 WL 18086 at *3 (6th Cir. 1986) (*per curium*) (unpublished) ("Privileges, of course, only protect against the disclosure of marital confidences in testimony, not cooperation with law enforcement officials."); *United States v. Winfree*, 170 F. Supp. 659, 660 (E.D. Pa. 1959) (holding that information volunteered by a spouse in an extra-judicial investigation was not improperly obtained).

That this evidence was not "illegally obtained" reflects the difference between the breach

of confidentiality, at issue here, and the violation of constitutional rights, at issue in *Murray*. *See generally* Mosteller, *Admissibility of Fruits of Breached Evidentiary Privileges*, *supra*; *see also United States v. Irons*, 646 F. Supp. 2d 927, 957 (E.D. Tenn. 2009) (noting that moving to suppress evidence derived from privileged marital communications under the constitutionally-based "fruit of the poisonous tree" doctrine is like "compar[ing] apples to oranges"). The "illegally obtained evidence" in *Murray* was gathered during an unauthorized search that violated the defendant's Fourth Amendment rights. The marital privileges, on the other hand, are merely evidentiary principles and "do not have constitutional underpinnings." *Lefkowitz*, 618 F.2d at 1319 (1980).[13]

Because the marital privileges are not grounded in the Constitution, federal and state courts have refused to suppress evidence "obtained as a result of one spouse's disclosure of confidential marital communications to the police." *Irons*, 646 F. Supp. 2d at 957; *accord Giavasis*, 1986 WL 18086 at *3; *People v. Lifrieri*, 597 N.Y.S. 2d 580, 602-03 (N.Y. Sup. Ct. 1993); *State v. Osborne*, 569 P.2d 1176, 1181 (Wash. Ct. App. 1977);[14] *cf. United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding that evidence derived from confidential psychoanalyst communications should not be suppressed "given that the privilege is a

---

[13] The Ninth Circuit has thus rejected the argument suggested by Defendant that the marital privileges implicate due process concerns for privacy. *See Lefkowitz*, 618 F.2d at 1319 (rejecting contention that the marital privileges "are somehow grounded in various constitutional amendments and implement a constitutionally-protected right of marital privacy"). This lack of constitutional grounding distinguishes cases involving the marital privileges from those cases involving constitutional privileges that Defendant cites in his reply brief. *See* Def.'s Reply, Dkt. 47, at 4-5.

[14] These state court cases typically involve state statutes that codify the marital privileges, in contrast to the federal common law of privileges applied by federal courts. Still, because the state statutes were developed based on the common law privileges, the Court finds the analysis of these questions by state courts to be helpful, even if not directly applicable.

testimonial or evidentiary one, and not constitutionally-based"); Mosteller, *Admissibility of Fruits of Breached Evidentiary Privileges*, *supra* (collecting cases involving other evidentiary privileges).

Indeed, the Ninth Circuit in dicta has twice suggested that suppression of evidence obtained through the use of confidential marital communications would be inappropriate. *See United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) ("[W]e need not resolve Marashi's claim that all evidence derived [from marital communications] should be excluded as fruits of the poisonous tree. Suffice it to say that no court has ever applied this theory to *any* evidentiary privilege…."); *Lefkowitz*, 618 F.2d at 1318 n.8 ("Because we reject … Lefkowitz's argument that the marital privileges are somehow constitutionally grounded in, among other locations, the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be 'tainted.'" (citing *Wong Sun v. United States*, 371 U.S. 471 (1963))).[15]

The only case of which the Court is aware that directly supports Defendant's position is *Muetze v. State*, 243 N.W. 2d 393 (Wisc. 1976). In *Muetze*, the state court suppressed evidence where probable cause for the search warrant relied on privileged marital communications. *See id.* at 397, 399. The Court need not decide whether suppression would be an appropriate remedy in this case if the probable cause finding had in fact relied on privileged evidence. The Court notes,

---

[15] In *Lefkowitz*, the Ninth Circuit held that most of the information provided by the defendant's spouse and included in the search warrant application was not privileged. *See* 618 F.2d at 1318-19. The court did not reach the question of whether, if the communications *had* been privileged, the search warrant would have been invalid. This Court does not agree with Mr. Carlson that *Lefkowitz* makes "clear" that the Ninth Circuit would have suppressed the evidence in such circumstances. *See* Def.'s Reply, Dkt. 47, at 4. A case cannot stand for a proposition that was not squarely presented to the deciding court and was not a necessary part of that court's holding.

however, that such an error would typically be a legal mistake on the part of the magistrate judge. If so, under Supreme Court case law arising after *Muetze*, suppression would not be appropriate unless the magistrate judge's error were so clear that law enforcement officers could not have relied on the search warrant in good faith. Further, the Court is not convinced that an evidentiary mistake can render a probable cause finding *constitutionally* deficient such that suppression of evidence seized in reliance on the warrant would be an appropriate sanction. For present purposes, it suffices to conclude that the presence of some privileged information in the search warrant applications did not render the resulting warrants constitutionally deficient.

## CONCLUSION

Because there was no Fourth Amendment violation that would warrant suppression, the Defendant's Motion to Suppress Evidence (Dkt. 35) is DENIED.

DATED this 24th day of May, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge